768 F.2d 1434
 248 U.S.App.D.C. 1, 54 USLW 2076, 12
Media L. Rep. 1001
 QUINCY CABLE TV, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
KHQ, Incorporated, Spokane Television, Inc., King
Broadcasting Company, Association of Independent Television
Stations, Inc., National Association of Broadcasters, and
Town of Quincy, Washington, Intervenors.
TURNER BROADCASTING SYSTEM, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Metromedia, Inc., Community Antenna Television Association,
Inc., Black Entertainment Television, National Religious
Broadcasters, Television Licensees, Association of
Independent Television Stations, Inc., Corporation For
Public Broadcasting, National Association of Broadcasters,
Spanish International Communications Corporation et al.,
National Association of Public Television Stations, Columbus
Broadcasting Company, Inc. et al., King Broadcasting
Company, National Cable Television Association, Inc.,
Association of Maximum Service Telecasters, Inc.,
McGraw-Hill Broadcasting Company, Inc. et al., National
Broadcasting Company, Inc., Station Representatives
Association, Taft Television and Radio Company, Inc., and
Maranatha Broadcasting Company, Inc., Intervenors.
 Nos. 83-1283, 83-2050.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 16, 1985.
Decided July 19, 1985.
 
 Petitions for Review of Orders of the Federal Communications commission.
 John P. Cole, Jr., Washington, D.C., with whom David M. Silverman, Washington, D.C., was on initial and supplemental briefs, for Quincy Cable TV, Inc., petitioner in No. 83-1283. John P. Cole, Jr., Washington, D.C., also entered an appearance for Town of Quincy, Wash., intervenor in No. 83-1283.
 Bruce D. Sokler, Washington, D.C., with whom Charles D. Ferris, Frank W. Lloyd, and L. Gregory Ballard, Washington, D.C., were on brief, for Turner Broadcasting System, Inc., petitioner in No. 83-2050.
 Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., for respondents in Nos. 83-1283 and 83-2050. Bruce E. Fein, then Gen. Counsel, F.C.C., Washington, D.C., was on initial brief for respondents in No. 83-1283 and on brief for respondents in No. 83-2050. Gregory M. Christopher, Atty., F.C.C., Washington, D.C., was on initial brief for respondents and Supplemental Brief for Respondents, Intervenors, and Amici Curiae pursuant to Court Order of October 16, 1984 in No. 83-1283, and entered an appearance for respondent F.C.C. in No. 83-2050. Robert G. Nicholson and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D.C., were on initial brief for respondents and the Supplemental Brief for Respondents, Intervenors, and Amici Curiae in No. 83-1283, and on brief for respondents in No. 83-2050. J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., was on Supplemental Brief for Respondents, Intervenors, and Amici Curiae in No. 83-1283 and on brief for respondents in No. 83-2050. Jack D. Smith, Gen. Counsel, F.C.C., Washington, D.C., was on Supplemental Brief for Respondents, Intervenors, and Amici Curiae in No. 83-1283. Jane E. Mago and C. Grey Pash, Jr., Attys., F.C.C., Washington, D.C., entered appearances for respondent F.C.C. in No. 83-2050.
 J. Laurent Scharff, Washington, D.C., with whom James M. Smith, Washington, D.C., was on initial and supplemental briefs in No. 83-1283 and on brief in No. 83-2050, for Ass'n of Independent Television Stations, Inc. and Nat. Ass'n of Broadcasters, intervenors in Nos. 83-1283 and 83-2050, and for Ass'n of Maximum Service Telecasters, Inc., McGraw-Hill Broadcasting Co., Inc., Metromedia, Inc., Nat. Broadcasting Co., Inc., and Taft Television and Radio Co., Inc., intervenors in No. 83-2050. Jonathan D. Blake, Paul J. Berman, and Gregory M. Schmidt, Washington, D.C., entered appearances for intervenor Association of Maximum Service Telecasters, Inc. Arthur B. Goodkind and Mary M. Hendriksen, Washington, D.C., entered appearances for intervenors McGraw-Hill Broadcasting Co., Inc. et al. Howard Monderer, Washington, D.C., entered an appearance for intervenor Nat. Broadcasting Co., Inc. Erwin G. Krasnow and Michael D. Berg, Washington, D.C., entered appearances for intervenor Nat. Ass'n of Broadcasters.
 Arthur Stambler, Erwin G. Krasnow, Michael D. Berg, Edward W. Hummers, Jr., and David G. Rozzelle, Washington, D.C., were on brief for Spokane Television, Inc., intervenor in No. 83-1283, and Nat. Ass'n of Broadcasters and King Broadcasting Co., intervenors in Nos. 83-1283 and 83-2050.
 R. Russell Eagan, Washington, D.C., was on brief for KHQ, Inc., intervenor in No. 83-1283.
 John Geoffrey Bentley, Washington, D.C., was on brief for Maranatha Broadcasting Co., Inc., intervenor in No. 83-2050. Laura Metcoff Klaus, Washington, D.C., entered an appearance for this intervenor.
 Norman P. Leventhal, Meredith S. Senter, Jr., and Barbara K. Kline, Washington, D.C., were on brief for Spanish Inter. Communications Corp. et al., intervenors in No. 83-2050.
 Stephen R. Effros was on brief for Community Antenna Television Ass'n, Inc., intervenor in No. 83-2050.
 Debra Lee Carter, Washington, D.C., was on brief for Black Entertainment Television, intervenor in No. 83-2050. Steven Reed, Washington, D.C., entered an appearance for this intervenor.
 Brenda L. Fox, Carol A. Melton, Robert St. John Roper, and Michael S. Schooler, Washington, D.C., were on brief for Nat. Cable Television Ass'n, Inc., intervenor in No. 83-2050.
 Baryn S. Futa and Susan Dillon, Washington, D.C., were on brief for Corp. for Public Broadcasting and Nat. Ass'n of Public Television Stations, intervenors in No. 83-2050.
 Edward W. Hummers, Jr., David G. Rozzelle, and Robert A. DePont, Washington, D.C., entered appearances for King Broadcasting Co., intervenor in Nos. 83-1283 and 83-2050.
 Lawrence A. Horn, Nancy H. Hendry, Eric H. Smith, and Lewis J. Paper, Washington, D.C., were on brief for Corp. for Public Broadcasting et al., amici curiae in No. 83-1283, urging affirmance. Robert S. Blacher entered an appearance for these amici.
 Daniel J. Popeo and Michael P. McDonald, Washington, D.C., were on brief for American Legal Foundation, amicus curiae in No. 83-2050, urging reversal.
 Before WRIGHT, GINSBURG and BORK, Circuit Judges.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Circuit Judge.
 
 
 1
 FCC regulations require cable television operators,[1] upon request and without compensation, to transmit to their subscribers every over-the-air television broadcast signal[2] that is "significantly viewed in the community" or otherwise considered local under the Commission's rules. 47 C.F.R. Secs. 76.57-76.61 (1984). Alleging that these mandatory carriage or "must-carry" rules violate the First Amendment rights of cable programmers, cable operators, and the viewing public, Turner Broadcasting Systems, Inc. (TBS), the owner of a variety of cable services,[3] petitioned the FCC to institute rulemaking procedures to delete the offending regulations.[4] Although acknowledging that the challenged rules deprive cable programmers of access to some audiences and "compel carriage of broadcast signals in place of alternate programming that subscribers, if given a choice, might otherwise choose," the Commission denied TBS's petition. Memorandum Opinion and Order, FCC 84-136, April 6, 1984 (hereinafter Opinion and Order ), at 3, Joint Appendix to No. 83-2050 (Turner JA) at 3. TBS now petitions for review of that denial. In a separate action, Quincy Cable Television, Inc. (Quincy), the operator of a cable system in Quincy, Washington, petitions for review of an FCC order requiring it to carry the signals of several local broadcast stations and imposing a $5,000 "forfeiture" for its failure to do so.[5]
 
 
 2
 In the course of reviewing those petitions, we have concluded and now hold that the must-carry rules are fundamentally at odds with the First Amendment and, as currently drafted, can no longer be permitted to stand.
 
 I. BACKGROUND
 
 3
 The Supreme Court has repeatedly stressed that "[e]ach medium of expression * * * must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975). See also Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981) (plurality opinion). Mindful that in applying the broad principles of the First Amendment to new media we must remain sensitive to the "differing natures, values, abuses and dangers" of each method of expression, Kovacs v. Cooper, 336 U.S. 77, 97, 69 S.Ct. 448, 459, 93 L.Ed. 513 (1949) (Jackson, J., concurring), we examine in detail the nature of cable television technology, the history and purposes of the FCC's regulation of that technology, and prior judicial assessments of the constitutionality of that regulation.
 
 
 4
 A. Cable Television Regulation and the Origins and Purposes of the Must-Carry Rules
 
 1.
 
 5
 Cable television and ordinary commercial broadcast television operate on the basis of wholly different technical and entrepreneurial principles. See generally Capital Cities Cable, Inc. v. Crisp, --- U.S. ----, 104 S.Ct. 2694, 2701, 81 L.Ed.2d 580 (1984). Conventional broadcasters radiate electromagnetic waves from a transmitting antenna. The waves are intercepted by the viewer's television receiver, typically via a rooftop antenna, and decoded to produce a video image. Broadcasters derive their revenues not by selling the signal to the viewer but by selling time to advertisers.[6] As a general rule, the larger the audience the greater the rate the broadcaster can charge.
 
 
 6
 In contrast, cable operators charge subscribers a fee for the right to view programming from a variety of broadcast and non-broadcast sources.[7] Although cable systems frequently have the capacity to originate programming, most of their viewing fare consists of retransmission of signals generated by independent entities. Typically, the system offers local over-the-air broadcast signals captured by a strategically located master antenna, distant broadcast signals, which are often imported via satellite, and non-broadcast signals transmitted exclusively to cable systems by satellite or microwave relay. The cable operator converts the signal received from these or other sources into an electronic impulse and delivers it to subscribers' homes over a coaxial cable. Because the cable signal reaches the home by wire and not via the physically limited electromagnetic spectrum, cable systems have the potential, often unrealized, to transmit many more signals than the airwaves can support. Some new or recently upgraded systems have the capacity to offer more than 100 channels.[8] More currently operational systems, however, can carry far fewer, typically from 12 to 36.[9]
 
 
 7
 Although initially reluctant to exercise jurisdiction over cable, by the mid-1960's the FCC had changed its position and undertook comprehensive regulation of the budding industry. See generally United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) (canvassing early history of FCC regulation of cable); D. LE DUC, CABLE TELEVISION AND THE FCC (1973). Fully recognizing that the statutory basis for its jurisdiction was far from explicit, the Commission nonetheless believed that oversight was imperative lest the "explosive" growth of the cable industry undermine the regulatory framework already established for ordinary broadcast television. Rules re Microwave-Served CATV, First Report and Order in Docket No. 14895, 38 FCC 683, 685, 697-716 (1965) (First Report and Order ); CATV, Second Report and Order in Docket No. 14895, 2 FCC2d 725 (1966) (Second Report and Order ).
 
 
 8
 The Commission's objective was not merely to protect an established industry from the encroachment of an upstart young competitor, although such a result was clearly the byproduct of the regulatory posture that developed.[10] Rather, the Commission took the position that without the power to regulate cable it could not discharge its statutory obligation to provide for "fair, efficient, and equitable" distribution of service among "the several States and communities." 47 U.S.C. Sec. 307(b) (1982). See First Report and Order, 38 FCC at 699; Second Report and Order, 2 FCC2d at 734-737. If permitted to grow unfettered, the Commission feared, cable might well supplant ordinary broadcast television. A necessary consequence of such displacement would be to undermine the FCC's mandate to allocate the broadcast spectrum in a manner that best served the public interest. In particular, if an unregulated, unlicensed cable industry were to threaten the economic viability of broadcast television, the Commission would be powerless to effect what it saw (and continues to see) as one of its cardinal objectives: the development of a "system of [free] local broadcasting stations, such that 'all communities of appreciable size [will] have at least one television station as an outlet for local self-expression.' " United States v. Southwestern Cable Co., supra, 392 U.S. at 174, 88 S.Ct. at 2003, quoting H.R.Rep. No. 87-1559, 87th Cong., 2d Sess. 3 (1962).
 
 2.
 
 9
 Almost from the beginning, the must-carry rules were a centerpiece of the FCC's efforts to actively oversee the growth of cable television.[11] Then, as now, the applicability of the rules varied according to such factors as the quality of the broadcast signal available in the community. In general, however, the rules required cable operators, upon request, to carry any broadcast signal considered local under the Commission's complex formula.[12] Affected parties could petition for a waiver from their must-carry obligations,[13] but the rules themselves drew few lines. They required carriage of every local or significantly viewed signal irrespective of the number of must-carry channels already being transmitted, the degree of programming duplication, or the channel capacity of a cable system.
 
 
 10
 Although the economic analysis initially advanced in support of the must-carry rules was somewhat complicated, the Commission's general objective was straight-forward: to assure that the advent of cable technology not undermine the financial viability of free, community-oriented television. If cable were to "drive out television broadcasting service," the Commission reasoned, "the public as a whole would lose far more--in free service, in service to outlying areas, and in local service with local control and selection of programs--than it would gain." First Report and Order, 38 FCC at 700. The must-carry rules, together with a comprehensive body of related regulations, would channel the development of the nascent cable industry to limit the risks it might pose to conventional broadcasting, "society's chosen instrument for the provision of video services." Inquiry Into the Economic Relationship Between Broadcasting and Cable Television, 71 FCC2d 632, 644 (1979) (Economic Inquiry Report ).
 
 
 11
 At the time of the initial promulgation of the rules, the Commission acknowledged that it had insufficient data to "predict with reliability" the extent of the risk posed by cable. First Report and Order, 38 FCC at 711. See also Second Report and Order, 2 FCC2d at 744-745. But the economic analysis posited by the broadcasting industry (and now espoused by the Commission[14]) painted a dire picture. First Report and Order, 38 FCC at 689. The profitability of local commercial television is dependent on advertising revenues, which in turn are dependent on the number of viewers in the audience. Self-evidently, an advertiser will pay less per unit of air time as viewership decreases. If a significant percentage of viewers subscribe to cable and if subscribers view cable to the exclusion of broadcast television, the audience will become fragmented. "A gain of a subscriber to the [cable] system will in most cases mean the effective loss of a potential viewer for the local station." Id. at 703. With access to a smaller (often less affluent) market, advertisers will pay less for air time and profits will decline, a consequence that both discourages others from seeking a broadcast license and, in the extreme case, might even result in financial failure of some existing stations. Only if local broadcasters were assured access to the whole of their allocated audience, the FCC believed, could the risk of audience fragmentation and the concomitant threat to free, local television be forestalled.
 
 
 12
 A central premise of this analysis was that a significant proportion of cable subscribers would cease to view local television unless such signals were carried by the cable system. At first blush, as the cable industry vigorously pointed out, this assumption was somewhat counter-intuitive. Almost without exception, the must-carry rules only mandate carriage of signals that can already be picked up off the air.[15] Although the cable attaches to the television set through the VHF outlet, an inexpensive switch (the "A/B switch") would enable a viewer to alternate between cable and off-air VHF signals.[16] Indeed, connection of the cable typically has no direct effect at all on receipt of UHF signals.[17] Thus, in principle, a cable subscriber with little or no effort could still view local broadcasts even without the benefit of the must-carry rules. If that were the case, cable's gain would not necessarily mean broadcast television's loss, and the Commission's reasoning would be deprived of its major premise.
 
 
 13
 But, as the FCC pointed out when it first enacted the rules, the technical availability of off-air signals does not necessarily defeat the assumption that without the must-carry rules a significant number of cable subscribers might curtail their viewing of local broadcast television. Even so minor a task as flicking an A/B switch, the Commission suggested, "is an obvious deterrent to its use." First Report and Order, 38 FCC at 702. Moreover, with or without a switch local signals are available to the subscriber only if the antenna remains attached. Yet, the Commission observed, one of the main selling points of cable is the prospect of dispensing with unsightly or expensive antennas. Id. at 702 n. 25. Finally, even if the antenna remains in place, cable retransmission of UHF signals usually provides a far clearer picture than is available off-air. Thus, the Commission suggested, without the benefit of must-carry UHF stations would be at a significant competitive disadvantage. Economic Inquiry Report, 71 FCC2d at 713; see also Cable Television Program Syndicated Exclusivity Rules, 79 FCC2d 663, 718 (1980) (Syndicated Exclusivity Rules.)
 
 
 14
 In sum, at the time of their original promulgation the Commission viewed the must-carry rules as critical stones in the regulatory bulwark erected to guard against destruction of free, community-oriented television. By forcing cable systems to carry local and significantly viewed broadcast signals, the Commission sought to channel the growth of cable in a manner consistent with the public's interest in the preservation of local broadcasting.
 
 3.
 
 15
 When it first promulgated the must-carry rules in the mid-1960's, the Commission recognized that it could not prove the factual predicates of its analysis. Although frankly relying on its "collective instinct" and "intuition," Inquiry Into Economic Relationship Between Television Broadcasting and Cable Television, 65 FCC2d 9, 14 (1977) (Notice of Inquiry ), it concluded that it would be inconsistent with its responsibilities to "withhold[ ] action until indisputable proof of irreparable damage to the public interest in television broadcasting has been compiled--i.e., by waiting 'until the bodies pile up' before conceding that the problem exists." First Report and Order, 38 FCC at 701.
 
 
 16
 In the ensuing years the Commission has repeatedly repromulgated and fine-tuned the must-carry rules. See Commission Proposals for Regulation of Cable Television, 31 FCC2d 115, 118-120 (1971); Cable Television Report and Order, 36 FCC2d 143, 173-176 (1972). It has, however, never reconsidered or seriously questioned the elaborate and concededly speculative premises on which its economic defense of the rules rests.[18]
 
 
 17
 This approach is in sharp contrast to the Commission's treatment of several other components of the regulatory framework imposed in the early years of its regulation of cable television. After conducting a comprehensive economic analysis based on a detailed and highly sophisticated examination of a number of discrete television markets, the Commission eliminated the distant-signal-carriage and syndicated-exclusivity rules.[19] Like the must-carry rules, the deleted regulations were originally promulgated to protect broadcast television from competition from the expanding cable industry. See Economic Inquiry Report; Syndicated Exclusivity Rules (deleting syndicated-exclusivity and distant-signal rules).
 
 
 18
 In the context of this wide-ranging deregulatory effort, the Commission acknowledged a radical shift in its perception of the role of cable in the array of viewing options available in a given community. Abandoning its initial view of cable as an auxiliary service that merely supplemented broadcasting by improving reception in outlying areas, the Commission now recognized cable as a legitimate, independent vehicle for providing alternative video services to the public. Economic Inquiry Report, 71 FCC2d at 645-646. With respect to the specific question of the continued value of the distant-signal and syndicated-exclusivity rules, the Commission found that its general economic analysis had failed to substantiate the intuitive fears on which the rules had been premised since the mid-1960's.
 
 
 19
 Upon examination of the economic evidence, we conclude that competition from cable television does not pose a significant threat to conventional television or to our overall broadcasting policies. * * * [A]udience losses attributable to increased competition from cable television take place in a context of offsetting factors. Increases in population and in the level of economic activity result in a fairly steady growth in the demand for advertising exposures and in station revenues. Thus, the ability of stations to maintain existing levels of service to their communities is likely to be unimpaired in the absence of our distant signal carriage rules.
 
 
 20
 Id. at 661. Stating that the comprehensive nature of its analysis enabled it to speak "with a clarity[ ] which is uncommon in matters of public policy," the Commission found that "continued regulatory intervention is not merely unnecessary, it is counterproductive." Id. at 659.
 
 
 21
 B. Prior Constitutional Challenges to Cable Regulations
 
 
 22
 On several occasions the Supreme Court has addressed questions concerning the breadth of the FCC's jurisdiction over cable television. See United States v. Southwestern Cable Co., supra, 392 U.S. at 178, 88 S.Ct. at 2005 (generally approving FCC jurisdiction over cable if "reasonably ancillary" to its regulation of broadcast television); United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972) (Midwest I ) (finding rule requiring cable operators to originate local programming within FCC's jurisdiction); FCC v. Midwest Video Corp., 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) (Midwest II ) (striking down as beyond the FCC's jurisdiction rules requiring cable operators to make channels available for local access). See also Capital Cities Cable, Inc. v. Crisp, supra, --- U.S. ----, 104 S.Ct. 2694, 81 L.Ed.2d 580 (discussing federal preemption of state laws regulating cable). However, in marked contrast to the extensive First Amendment jurisprudence developed in the context of the broadcast media, see, e.g., FCC v. League of Women Voters of California, --- U.S. ----, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Court has never confronted a challenge to the constitutional validity of the must-carry rules or any other regulation affecting cable television.[20]
 
 
 23
 In the lower federal courts questions concerning the constitutionality of various cable regulations arose almost from the first moment the Commission asserted its regulatory jurisdiction over the industry. The initial challenges, which were brought when cable was in its infancy and apocalyptic visions of its impact were common, met with little success. See, e.g., Titusville Cable TV, Inc. v. United States, 404 F.2d 1187 (3d Cir.1968); Black Hills Video Corp. v. FCC, 399 F.2d 65, 69 (8th Cir.1968); Buckeye Cablevision, Inc. v. FCC, 387 F.2d 220 (D.C.Cir.1967); Carter Mountain Transmission Corp. v. FCC, 321 F.2d 359 (D.C.Cir.), cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963).
 
 
 24
 These decisions took one of two paths to dispose of the cable operators' First Amendment contentions, often in a single brief paragraph. The most common approach was simply to treat cable and broadcast television as indistinguishable for purposes of First Amendment analysis. Because it was well established that broadcast media could be subject to regulation far more intrusive than the First Amendment would tolerate in other contexts, it naturally followed for these courts that cable regulation, a variant on the same theme, should be subject to no more exacting scrutiny. See, e.g., Black Hills Video Corp. v. FCC, supra, 399 F.2d at 69 ("[i]t is irrelevant * * * that [cable] systems do not themselves use the airwaves"). Other courts undertook a somewhat more discriminating analysis. They upheld the regulations only after concluding that the restraint on speech was no greater than was reasonably required to serve the important interest of preserving local broadcasting. Buckeye Cablevision, Inc. v. FCC, supra, 387 F.2d at 225.
 
 
 25
 In recent years the lower federal courts have subjected FCC regulation of cable television to a far more rigorous constitutional analysis. It is now clearly established, for example, that cable operators engage in conduct protected by the First Amendment. See, e.g., Tele-Communications of Key West, Inc. v. United States, 757 F.2d 1330, 1336 (D.C.Cir.1985); Preferred Communications, Inc. v. City of Los Angeles, 754 F.2d 1396 (9th Cir.1985); Midwest Video Corp. v. FCC, 571 F.2d 1025, 1052-1057 (8th Cir.1978), aff'd on other grounds, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). Most of these courts, mindful of the Supreme Court's repeated admonitions to be sensitive to the unique features of each medium of expression, have cautioned against reflexive invocation of the more forgiving First Amendment standards applicable to broadcast regulations. See, e.g., Preferred Communications, Inc. v. City of Los Angeles, supra, 754 F.2d at 1403; Home Box Office, Inc. v. FCC, 567 F.2d 9, 44-45 (D.C.Cir.) (per curiam ), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).[21] Indeed, in Home Box Office this court noted that earlier cases that had considered the intersection of the First Amendment and cable television regulations had incorrectly relied on Supreme Court precedent developed in the context of regulation of the broadcast media. Of particular note, the court "rejected" by name the reasoning of the Eighth Circuit in Black Hills Video Corp. v. FCC, supra, the only court to have explicitly considered the constitutionality of the must-carry rules. 567 F.2d at 45 n. 80.
 
 
 26
 At issue in Home Box Office were a number of FCC regulations limiting the programming fare a cablecaster[22] could offer its subscribers. The Commission defended the rules by suggesting that they were necessary to assure that the various forms of pay television, including cable, not degrade the quality of programming on conventional broadcast television. As in the present controversy, the Commission suggested that the competitive injury to broadcasters would be felt most acutely by those who could not afford the more expensive video services.
 
 
 27
 The court rejected the FCC's argument and sustained the First Amendment challenge. Concluding that the regulation should be treated as an incidental burden on speech, the court applied the test announced by the Supreme Court in United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Thus the regulations would be valid only if they served a substantial governmental interest and were no more intrusive than necessary to serve that interest. 567 F.2d at 48.
 
 
 28
 Measured against this standard, the court found the regulations wanting. They failed the first component of the test because the FCC had "not put itself in a position to know" whether its fears about the effect of cable television on local broadcasting were "real or merely * * * fanciful." Id. at 50. The regulations failed to clear the second O'Brien hurdle because they were "grossly overbroad," indiscriminately limiting the programming of cable systems whether or not the limits in fact served to protect the interests the rules purported to serve. Id. at 51.
 
 
 29
 In sum, the Supreme Court has never addressed the constitutional validity of the must-carry rules or of any of the analogous FCC regulations affecting cable television. To the extent the Court has considered the issue at all, it has described the question as "not frivolous." Midwest II, 440 U.S. at 709 n. 19, 99 S.Ct. at 1446 n. 19. In the lower federal courts the initial trend was to sustain the regulations against First Amendment and due process challenges. In recent years, however, the courts have subjected governmental regulation of cable to far more exacting constitutional scrutiny. The 1977 decision in Home Box Office suggested that FCC regulation of cable could withstand analysis under the First Amendment only if the Commission proved that the regulation burdened speech only incidentally, served an important governmental interest, and was no broader than necessary to further that interest.
 
 C. The TBS and Quincy Petitions
 
 30
 1. TBS. In 1980 TBS petitioned the FCC to institute rulemaking to consider deleting the must-carry rules. Petition For Rulemaking To Delete The Cable "Must Carry" Rules, October 15, 1980, Turner JA at 5-17. In support of its petition TBS argued that the regulatory environment had changed substantially since the original promulgation of the rules and that the factual premises and economic assumptions on which the rules were premised had long since been disproved or abandoned. Id. at 6-11. In addition, it suggested that the must carry-rules could not survive the constitutional test set out in Home Box Office. Id. at 11-16.
 
 
 31
 TBS's economic grievance was straightforward. As a cable programmer, TBS is in the business of selling a package of programming to the independent cable operators, who actually deliver the cable signal in the communities they are franchised to serve.[23] If, because of the must-carry rules, a significant number of a cable operator's channels are occupied by the signals of local broadcasters, programmers will face artificially stiff competition for the limited number of channels that remain available for non-mandatory transmissions. If the cable system is "saturated" with must-carry signals, a phenomenon recognized by the Commission, the rules operate to deprive programmers of any opportunity at all to sell their services.[24]
 
 
 32
 The TBS petition fell into something of a black hole. Although extensive comments were filed by interested members of the broadcast and cable industry, the FCC took no action. On March 21, 1983 TBS filed a Petition for Expedited Consideration, Turner JA at 43, again contending that the First Amendment as well as general principles of administrative law required reevaluation of the rules. When that petition too elicited no response, TBS sought review in this court, requesting that we compel the Commission to institute rulemaking or, at least, respond to its petition. Just before its brief was due the Commission moved the court to remand the record so that it could act on the TBS petition. On March 23, 1984 that motion was granted.
 
 
 33
 Two weeks later the Commission issued a three-page memorandum order in which it formally denied the petition for rulemaking. Opinion and Order, Turner JA at 1-4. Its First Amendment analysis was limited to a single, unadorned citation to the Eighth Circuit's decision in Black Hills Video Corp. v. FCC, supra. The Commission acknowledged that the rules were "intended to compel carriage of broadcast signals in place of alternate programming that subscribers, if given their choice, might otherwise choose" and that the rules place cable programmers "on an unequal footing" because they "take[ ] cable channels out of the marketplace where nonbroadcast program originators might otherwise have been able to negotiate for their use." Turner JA at 3. Nonetheless, it concluded that TBS had failed to demonstrate that the countervailing interest of protecting local television had ceased to justify continuation of the rules. Believing that rulemaking would be premature until "a more complete factual base," id., were developed, the Commission denied TBS's petition.
 
 
 34
 TBS now petitions for review of that denial, requesting, in the alternative, that we set aside the rule as unconstitutional or compel the Commission to institute rulemaking to reconsider the rules.
 
 
 35
 2. Quincy. Quincy operates a cable television system in Quincy, Washington, a small town approximately 125 miles equidistant from Seattle and Spokane. At the origin of this proceeding Quincy had a 12-channel capacity, and all 12 channels were in use. Exercising its editorial and commercial discretion, Quincy had elected to provide its subscribers with a channel that originated on the cable system itself, the signals of the three network affiliates in Seattle, the largely duplicative signals of the three network affiliates in Spokane, a Spokane-based public broadcasting station, and four other channels offering a wide variety of public affairs and entertainment programming. Of the 12 channels, only the four Spokane stations could be received without the benefit of cable.[25]
 
 
 36
 In 1979, after conducting a survey, Quincy came to believe that its subscribers would prefer to view three specialized cable programmers, including a 24-hour news service, instead of the three commercial Spokane stations. Although the three Spokane stations had not yet formally requested carriage (thus triggering Quincy's "must-carry" obligation), Quincy recognized that such a request would almost certainly follow the announcement of its intention to delete the three signals from its system. Accordingly, Quincy wrote the Commission and, in effect, petitioned for a partial waiver from the force of the rules. Letter from Quincy Cable TV, Inc. to Willard Nichols, Chief of FCC Cable Television Bureau, November 19, 1979, Quincy JA at 37.
 
 
 37
 In April 1980 the Cable Television Bureau of the FCC denied Quincy's waiver request. Letter from Willard Nichols, Chief of Cable Television Bureau, to Quincy Cable TV, Inc., April 28, 1980, Quincy JA at 1. Technically not under the compulsion of the must-carry rules until the Spokane stations requested carriage,[26] Quincy deleted two of the stations from its system. It then began a long series of administrative appeals of the waiver denial. At every stage Quincy advanced, and the Bureau rejected, the argument that the must-carry rules violated the First Amendment to the Constitution.[27] When Quincy continued to refuse carriage of the Spokane stations even after two of them formally requested carriage, the full Commission upheld the denial of the waiver and imposed a $5,000 "forfeiture." Quincy Cable TV, Inc., 89 FCC2d 1128 (1982). Although Quincy did at that point reinstate the two Spokane stations, it continued to press its claim before the Commission. When the full Commission again upheld the imposition of the forfeiture, Quincy petitioned this court for review.
 
 
 38
 On the eve of oral argument the court learned of factual developments occurring during the pendency of the petition and remanded the case to the FCC for reconsideration in light of the changed circumstances.[28] Quincy Cable TV, Inc. v. FCC, 730 F.2d 1549 (D.C.Cir.1984). On remand, the Commission ordered Quincy to supplement its filings. Believing that Quincy's supplementary submission served only to validate its earlier position, the Commission reaffirmed its decision to deny the requested waiver and impose a $5,000 forfeiture for failure to comply with the must-carry rules. This petition ensued.
 
 II. THE FIRST AMENDMENT: STANDARD OF REVIEW
 
 39
 The task of determining the appropriate standard of First Amendment review to apply to the must-carry rules requires us to address two distinct questions.[29] We begin by evaluating whether First Amendment principles governing regulation of the broadcast media should also apply to regulation of cable television. Concluding that cable television warrants a standard of review distinct from that applied to broadcasters, we next consider whether the must-carry rules merit treatment as an "incidental" burden on speech and therefore warrant analysis under the balancing test set out in United States v. O'Brien, supra, 391 U.S. at 382, 88 S.Ct. at 1681. Although our review leaves us with serious doubts about the appropriateness of invoking O'Brien 's interest-balancing formulation, we conclude that the rules so clearly fail under that standard that we need not resolve whether they warrant a more exacting level of First Amendment scrutiny.
 
 A. The Scarcity Rationale
 
 40
 It has become something of a truism to observe that "differences in the characteristics of news media justify differences in the First Amendment standards applied to them." Red Lion Broadcasting Co. v. FCC, supra, 395 U.S. at 386, 89 S.Ct. at 1804. See also FCC v. Pacifica Foundation, 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978); Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952); Tele-Communications of Key West, Inc. v. United States, supra, 757 F.2d at 1338-39. The suggestion is not that traditional First Amendment doctrine falls by the wayside when evaluating the protection due novel modes of communication. For the core values of the First Amendment clearly transcend the particular details of the various vehicles through which messages are conveyed. Rather, the objective is to recognize that those values are best served by paying close attention to the distinctive features that differentiate the increasingly diverse mechanisms through which a speaker may express his view.
 
 
 41
 This sensitivity to the uniqueness of each medium precludes facile adoption of the First Amendment jurisprudence that has developed around challenges to FCC regulation of broadcast television and radio. From the perspective of the viewer, no doubt, cable and broadcast television appear virtually indistinguishable. For purposes of First Amendment analysis, however, they differ in at least one critical respect. Unlike ordinary broadcast television, which transmits the video image over airwaves capable of bearing only a limited number of signals, cable reaches the home over a coaxial cable with the technological capacity to carry 200 or more channels.[30]
 
 
 42
 The distinction is of fundamental significance in light of the Supreme Court's oft-repeated suggestion that the First Amendment tolerates far more intrusive regulation of broadcasters than of other media precisely because of the inescapable physical limitations on the number of voices that can simultaneously be carried over the electromagnetic spectrum. See, e.g., FCC v. League of Women Voters of California, supra, 104 S.Ct. at 3116; see also Preferred Communications, Inc. v. City of Los Angeles, supra, 754 F.2d at 1403.[31] These limitations, the Supreme Court observed early on, engender a peculiar irony of the broadcast medium: limited regulation, by converting aural and visual chaos into channels of effective communication, furthers rather than impedes the First Amendment's mission. "With everybody on the air," wrote Justice Frankfurter, "nobody could be heard. * * * [T]he radio spectrum is simply not large enough to accommodate everybody." National Broadcasting Co. v. United States, 319 U.S. 190, 212-13, 63 S.Ct. 997, 1007-08, 87 L.Ed. 1344 (1943). Without the imposition of some governmental control, "the cacophony of competing voices" would drown each other out. Red Lion Broadcasting Co. v. FCC, supra, 395 U.S. at 376, 89 S.Ct. at 1799. Moreover, quite independent of the objective of bringing communicative order to the otherwise chaotic airwaves, the First Amendment tolerates a modest degree of government oversight of broadcast radio and television because such regulation assures that broadcasters, privileged occupants of a physically scarce resource, act in a manner consistent with their status as fiduciaries of the public's interest in responsible use of the spectrum. Id. at 389, 89 S.Ct. at 1806.
 
 
 43
 As this and other courts have recognized, the "scarcity rationale" has no place in evaluating government regulation of cable television.[32]
 
 
 44
 The First Amendment theory espoused in National Broadcasting Co. and reaffirmed in Red Lion Broadcasting Co. cannot be directly applied to cable television since an essential precondition of that theory--physical interference and scarcity requiring an umpiring role for government--is absent. * * *
 
 
 45
 Home Box Office, Inc. v. FCC, supra, 567 F.2d at 45. See also Preferred Communications, Inc. v. City of Los Angeles, supra, 754 F.2d at 1404; Omega Satellite Products Co. v. City of Indianapolis, 694 F.2d 119, 127 (7th Cir.1982); Note, Cable Television and the First Amendment, 71 COLUM.L.REV. 1008 (1971).
 
 
 46
 Nor do we discern other attributes of cable television that would justify a standard of review analogous to the more forgiving First Amendment analysis traditionally applied to the broadcast media. We cannot agree, for example, that the mere fact that cable operators require use of a public right of way--typically utility poles--somehow justifies lesser First Amendment scrutiny. See Omega Satellite Products Co. v. City of Indianapolis, supra, 694 F.2d at 127. The potential for disruption inherent in stringing coaxial cables above city streets may well warrant some governmental regulation of the process of installing and maintaining the cable system. But hardly does it follow that such regulation could extend to controlling the nature of the programming that is conveyed over that system. No doubt a municipality has some power to control the placement of newspaper vending machines. But any effort to use that power as the basis for dictating what must be placed in such machines would surely be invalid.[33]
 
 
 47
 Nor, on this record, can we concur in the suggestion that the "natural monopoly characteristics" of cable create economic constraints on competition comparable to the physical constraints imposed by the limited size of the electromagnetic spectrum. Omega Satellite Products Co. v. City of Indianapolis, supra, 694 F.2d at 127; see also Berkshire Cablevision of Rhode Island, Inc. v. Burke, 571 F.Supp. 976, 985-988 (D.R.I.1983). At the outset, the "economic scarcity" argument rests on the entirely unproven--and indeed doubtful--assumption that cable operators are in a position to exact monopolistic charges. See G. SHAPIRO, P. KURLAND & J. MERCURIO, CABLESPEECH: THE CASE FOR FIRST AMENDMENT PROTECTION 9-11 (1983). Moreover, the tendency toward monopoly, if present at all, may well be attributable more to governmental action--particularly the municipal franchising process--than to any "natural" economic phenomenon. See R. POSNER, CABLE TELEVISION: THE PROBLEM OF LOCAL MONOPOLY 4 (Ford Foundation Memorandum RM-6309-FF 1970). In any case, whatever the outcome of the debate over the monopolistic characteristics of cable, the Supreme Court has categorically rejected the suggestion that purely economic constraints on the number of voices available in a given community justify otherwise unwarranted intrusions into First Amendment rights. Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 247-256, 94 S.Ct. 2831, 2834-2839, 41 L.Ed.2d 730 (1974). While Miami Herald involved the conventional press, as this court has had prior occasion to observe, there is no meaningful "distinction between cable television and newspapers on this point." Home Box Office, Inc. v. FCC, supra, 567 F.2d at 46.
 
 
 48
 Indeed, once one has cleared the conceptual hurdle of recognizing that all forms of television need not be treated as a generic unity for purposes of the First Amendment, the analogy to more traditional media is compelling. Two influential commissions have in fact reached precisely that conclusion. In the words of the Cabinet Committee on Cable Communications, "[C]able development has the potential of creating an electronic medium of communications more diverse, more pluralistic and more open, more like the print and film media than like our present broadcast system." CABINET COMMITTEE ON CABLE COMMUNICATIONS, CABLE: REPORT TO THE PRESIDENT, Ch. I, p. 14 (1974). See also SLOAN COMMISSION ON CABLE COMMUNICATIONS, ON THE CABLE 92 (1971) ("Cable television, by freeing television from the limitations of radiated electro-magnetic waves, creates * * * a situation more nearly analogous to that of the [print] press.").[34]
 
 
 49
 In sum, beyond the obvious parallel that both cable and broadcast television impinge on the senses via a video receiver, the two media differ in constitutionally significant ways. In light of cable's virtually unlimited channel capacity, the standard of First Amendment review reserved for occupants of the physically scarce airwaves is plainly inapplicable. Accordingly, we must look elsewhere to determine the appropriate yardstick against which to measure the constitutionality of the must-carry rules.
 
 
 50
 B. The Appropriateness of Treating The Must-Carry Rules as an Incidental Burden on Speech
 
 
 51
 That cable television shares attributes of the more traditional press does not, of course, suggest that the First Amendment interposes an impermeable bulwark against any regulation. As the Home Box Office court observed, for cable, no less than for other media, the First Amendment draws a distinction between "incidental" burdens on speech--regulations that evince a governmental interest unrelated to the suppression or protection of a particular set of ideas--and restrictions that are "intended to curtail expression--either directly by banning speech because of * * * its communicative or persuasive effect on its intended audience * * * or indirectly by favoring certain classes of speakers over others * * *." 567 F.2d at 47-48.
 
 
 52
 If the regulation falls in the former category, it will be sustained if "it furthers an important or substantial governmental interest * * * and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." United States v. O'Brien, supra, 391 U.S. at 377, 88 S.Ct. at 1679. See also Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984); Procunier v. Martinez, 416 U.S. 396, 411, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974); National Black United Fund, Inc. v. Devine, 667 F.2d 173, 179 (D.C.Cir.1981). If, however, the regulation cannot fairly be understood as a merely incidental restriction on expression, the regulation will be upheld, if at all, only if the government adequately carries a significantly heavier burden of justification.[35] Indeed, some governmental objectives--"such as a desire to suppress support for a minority party or an unpopular cause, or to exclude the expression of certain points of view from the marketplace of ideas--* * * are so plainly illegitimate" that they are forbidden altogether. Members of City Council of Los Angeles v. Taxpayers for Vincent, supra, 104 S.Ct. at 2128.
 
 
 53
 Thus the threshold question before us, as before the court in Home Box Office, is whether the intrusion worked by the challenged regulations merits treatment as an "incidental" burden on speech. In Home Box Office the court found that the FCC cable rules there at issue were best understood as embodying an interest unrelated to speech and therefore qualified for the analytic track set out in O'Brien and its progeny. That conclusion, as we now show, is far less certain in the context of the present challenge.
 
 
 54
 In one sense, of course, as is invariably the case,[36] the government can frame the interest served by the must-carry rules in essentially speech-neutral terms. So framed, the rules' object is to assure that the rise of a potentially monolithic national television industry not undermine the economic vitality of free, locally-controlled broadcasting.
 
 
 55
 Yet even so understood, the Commission's objective is a far cry from the sort of interests that typically have been viewed as imposing a merely "incidental" burden on speech. Although not intended to suppress or protect any particular viewpoint, the rules are explicitly designed to "favor[ ] certain classes of speakers over others." Home Box Office, Inc. v. FCC, supra, 567 F.2d at 48. Their very purpose is to bolster the fortunes of local broadcasters even if the inevitable consequence of implementing that goal is to create an overwhelming competitive advantage over cable programmers. Opinion and Order, Turner JA at 3. Under the protective aegis of the rules, local broadcasters are guaranteed the right to convey their messages over the cable system while cable programmers must vie for a proportionately diminished number of channels. In the case of systems saturated with mandatory signals, cable programmers are shut out entirely from the only forum capable of conveying their programming. Because "the concept that government may restrict the speech of some elements of society in order to enhance the relative voice of others is wholly foreign to the First Amendment," Buckley v. Valeo, 424 U.S. 1, 48-49, 96 S.Ct. 612, 648-49, 46 L.Ed.2d 659 (1976), the conclusion that the must-carry rules burden First Amendment rights only incidentally is far from inevitable.[37]
 
 
 56
 Viewed from the perspective of the cable operator, the entity that delivers a preselected package of channels to paying subscribers, the must-carry rules are equally intrusive. The rules coerce speech; they require the operator to carry the signals of local broadcasters regardless of their content and irrespective of whether the operator considers them appropriate programming for the community it serves. The difficulty is not so much that the rules force operators to act as a mouthpiece for ideological perspectives they do not share, see Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977), although such a result is by no means implausible.[38] The more certain injury stems from the substantial limitations the rules work on the operator's otherwise broad discretion to select the programming it offers its subscribers. See Miami Herald Co. v. Tornillo, supra, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (recognizing First Amendment protection of editorial discretion).
 
 
 57
 Although in cable's infancy cable operators served exclusively as passive conduits of broadcast signals, their editorial role has expanded dramatically over the course of the industry's brief history. See generally H.R.Rep. No. 98-934, 98th Cong., 2d Sess. 20-22 (1983). No longer mere "funnel[s] for other broadcasting," Note, The Wire Mire: The FCC and CATV, 79 HARV.L.REV. 366, 367 (1965), operators now select from "a rich variety" of additional options, including locally originated cablecasts, and the programming of over 40 independent cable networks, which offer such diverse fare as movies, sports, news, live coverage of public events, and specialized presentations aimed at individual segments of the national audience. In re Community Cable TV, Inc., 54 Rad.Reg.2d (P & F) 1351, 1359 (1983). See generally H.R.Rep. No. 98-934, supra, at 21.[39]
 
 
 58
 Indeed, in the context of reviewing the FCC's power to promulgate regulations mandating public access to cable channels, the Supreme Court explicitly acknowledged the breadth of the editorial judgment exercised by cable operators. Midwest II, 440 U.S. at 707-08 n. 17, 99 S.Ct. at 1445 n. 17. No less than the access regulations at issue in Midwest II, the must-carry rules "significantly compromise" the cable operator's editorial discretion: "Even when not occasioning the displacement of alternative programming, compelling cable operators indiscriminately to accept * * * programming will interfere with their determinations regarding the total service offering to be extended to subscribers." Id. Moreover, unlike access rules, which serve countervailing First Amendment values by providing a forum for public or governmental authorities, the must-carry rules transfer control to local broadcasters who already have a delivery mechanism granted by the government without cost and capable of bypassing the cable system altogether.
 
 
 59
 That the intrusion into cable operators' editorial autonomy is deep does not, of course, require the conclusion that the rules are inappropriate for analysis under the O'Brien test. Cf. Procunier v. Martinez, supra, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224. Nonetheless, the Supreme Court's prior treatment of other laws and regulations that impinged on the editorial function engenders at least some doubt about the appropriateness of shunting the must-carry rules onto the analytical track reserved for other incidental burdens on expression. Even for broadcasters, regulations that transfer control over programming content to others have met with approval only grudgingly and then only in highly specialized circumstances and without reference to the O'Brien balancing formulation. See CBS, Inc. v. FCC, 453 U.S. 367, 396, 101 S.Ct. 2813, 2830, 69 L.Ed.2d 706 (1981). More significantly, as the Court made clear in Miami Herald Publishing Co. v. Tornillo, supra, once outside the special constitutional realm reserved for privileged occupants of the physically scarce airwaves, the First Amendment guards against governmental intrusions into the editorial function even more jealously. Compare Red Lion Broadcasting Co. v. FCC, supra, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371.
 
 
 60
 Indeed, if Miami Herald supplies the appropriate mode of First Amendment analysis, our inquiry would be at an end without any need for testing the rules against the other O'Brien factors or applying any other form of interest-balancing.[40] In Miami Herald the Court faced a constitutional challenge to a Florida statute that required newspapers to grant a right to reply to political candidates attacked in earlier editions. Without so much as alluding to even the possibility of a subordinating governmental interest, the Court invalidated the statute. Forcing an editor to print that which he otherwise would not, the Court held, was a restraint the First Amendment simply would not tolerate. The result would be no different, the Court took pains to note, even if it could be shown that complying with the statute would cause the newspaper to suffer no additional costs. 418 U.S. at 258, 94 S.Ct. at 2839.[41]
 
 
 61
 In short, our examination of the purposes that underlie the must-carry rules, the nature and degree of the intrusions they effect, and prior judicial treatment of analogous regulations leaves us with serious doubts about the propriety of applying the standard of review reserved for incidental burdens on speech. Although the goal of the rules--preserving local broadcasting--can be viewed as unrelated to the suppression or protection of any particular set of ideas, the rules nonetheless profoundly affect values that lie near the heart of the First Amendment. They favor one group of speakers over another. They severely impinge on editorial discretion. And, most importantly, if a system's channel capacity is substantially or completely occupied by mandatory signals, the rules prevent cable programmers from reaching their intended audience even if that result directly contravenes the preference of cable subscribers. Indeed, as a matter of established regulatory policy, the Commission considers the desires of cable subscribers to be irrelevant to the application of the rules. See, e.g., In Re Group W Cable, Inc., 57 Rad.Reg.2d (P & F) 637, 639 (1984). This conscious disregard of subscribers' viewing preferences is difficult, if not impossible, to reconcile with the Supreme Court's repeated admonition that the interests of viewers should be considered "paramount" in the First Amendment calculus. Red Lion Broadcasting Co. v. FCC, supra, 395 U.S. at 390, 89 S.Ct. at 1806. While, of course, viewers of broadcast television also have significant First Amendment interests, we doubt very much that cable subscribers "can[ ] be left out of the equation" entirely. Community Communications Co. v. City of Boulder, 660 F.2d 1370, 1376 n. 5 (10th Cir.1981), cert. denied, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982).
 
 
 62
 We need not, however, definitively decide whether a more exacting standard than that announced in O'Brien and applied in Home Box Office is the correct test for evaluating the constitutionality of the must-carry rules. For even if we assume that the regulations burden speech only incidentally and therefore can pass muster under the First Amendment if they "further[ ] an important or substantial governmental interest" and impose a restriction "no greater than is essential to the furtherance of that interest," Home Box Office, Inc. v. FCC, supra, 567 F.2d at 48, we have concluded that the must-carry regulations, as written, are clearly impermissible.
 
 III. THE STANDARD APPLIED
 
 63
 A. The Substantiality of the Governmental Interest
 
 
 64
 The Commission contends that the must-carry rules serve the interest of preserving free, locally-oriented television.[42] The difficult question whether, taken as an abstract proposition, that interest is sufficiently weighty to warrant the rules' interference with First Amendment rights must await resolution in another case. For even if we accept the common wisdom that the goal of encouraging "localism" qualifies as "important or substantial," United States v. O'Brien, supra, 391 U.S. at 377, 88 S.Ct. at 1679,[43] we would be unable to find that the FCC has carried its heavy burden of justification.
 
 
 65
 In many circumstances the mere abstract assertion of a substantial governmental interest, standing alone, is insufficient to justify the subordination of First Amendment freedoms. Two such circumstances are relevant to this petition. First, if, as petitioners allege, the Commission has generally concluded that cable poses no threat to broadcasting, this change in perspective clearly would undermine its suggestion that "localism" is sufficiently important or substantial to warrant the significant abridgment of protected activity effected by the must-carry rules. Second, as this court stressed in Home Box Office, in the administrative context O'Brien's substantial interest requirement "translates * * * into a record that convincingly shows a problem to exist." 567 F.2d at 50.[44] At least in those instances in which both the existence of the problem and the beneficial effects of the agency's response to that problem are concededly susceptible of some empirical demonstration, the agency must do something more than merely posit the existence of the disease sought to be cured. In the context of this case the question becomes whether the Commission has adequately proven that without the protection afforded by the must-carry rules the economic health of local broadcast television is threatened by cable.
 
 
 66
 We address each issue in turn.
 
 1.
 
 67
 In a burst of deregulatory activity unparalleled in its history, the FCC has recently dismantled large portions of the extensive regulatory structure under which both broadcast and cable television have labored for many decades. See, e.g., Revision of Programming and Commercialization Policies, Ascertainment Requirements, and Program Log Requirements for Commercial Television Stations, 49 Fed.Reg. 33588 (1984) (to be codified at Part 73 of 4 C.F.R. ) (Revision of Programming ). Details aside, the thrust of this movement has been the Commission's belief that the public interest in diverse video options is best served by deferring to the marketplace. Id.; Economic Inquiry Report, 71 FCC2d at 697. As part of this comprehensive endeavor, the Commission has eliminated numerous regulations which, like the must-carry rules, were premised on the desire to protect local broadcasters from competition from the expanding cable industry. See, e.g., Syndicated Exclusivity Rules, 79 FCC2d 663 (deleting distant-signal and syndicated-exclusivity rules). In addition, it has authorized a wide array of new multichannel video competitors to over-the-air broadcast television and exempted them from any obligation to carry local programming. See, e.g., Inquiry Into the Development of Regulatory Policy in Regard to Direct Broadcast Satellites, 90 FCC2d 676, 691-692 (1982) (DBS Inquiry ).
 
 
 68
 Petitioner TBS contends that in the course of this deregulation the Commission has disclaimed the very premises on which the must-carry rules are founded.[45] If, in fact, the FCC has repudiated the economic assumptions that underlie the must-carry rules, the suggestion that they serve an important governmental interest (or any interest at all) would be wholly unconvincing. As the Home Box Office court stated, "[A] 'regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist.' " 567 F.2d at 36 (quoting City of Chicago v. FPC, 458 F.2d 731, 742 (D.C.Cir.1971)). Similarly, an asserted interest in alleviating or forestalling a problem--such as the destruction of free, local television--can hardly be considered "important or substantial" if the government now denies that the alleged problem is a problem at all.
 
 
 69
 TBS places particular reliance on the conclusions of the Economic Inquiry Report, the Commission's comprehensive analysis that culminated in deletion of several of the must-carry rules' regulatory siblings. "Upon examination of the economic evidence," the Commission stated, "we conclude that competition from cable television does not pose a significant threat to conventional television or to our overall broadcasting policies. * * * [C]able does not appear to be a major negative force on the financial situation of television broadcasters * * *." 71 FCC2d at 661, 688. These conclusions, if given the broad applicability their sweeping tone suggests, would fatally undercut the Commission's argument that the must-carry rules serve the important end of preventing the destruction of free, local broadcasting.
 
 
 70
 The Commission parries this potentially mortal thrust by contending that the Economic Inquiry Report focused only on the effect of deleting the distant-signal and syndicated-exclusivity rules and "expressly assumed the continuation of the must carry rule[s]." Brief for respondents in No. 83-2050 at 11. That characterization is, at the very least, debatable. With the conclusions of the Economic Inquiry Report already in mind, the Commission, citing "administrative[ ] efficien[cy]," did explicitly exclude the must-carry rules from the proceedings that looked toward actual deletion of the distant-signal and syndicated-exclusivity rules. Notice of Proposed Rule-making, 71 FCC2d 1004, 1006 (1979). TBS, however, focuses not on these rulemaking proceedings but on the antecedent Economic Inquiry Report.[46] That report, which was described by the Commission as "a general review of the economics of the relationship between television broadcasting and cable television," contains no such express reservation. Notice of Proposed Rulemaking, 71 FCC2d at 1005. Indeed, in embarking on its comprehensive economic analysis the Commission expressly excluded "debate over the merits of the existing regulatory" framework from its more "generalized inquiry." Notice of Inquiry, 65 FCC2d at 9-10.
 
 
 71
 More fundamentally, there is an obvious difference between reserving a matter for later consideration and holding its existence constant in the course of analyzing the interplay of other variables.[47] Although some of the studies relied on by the Commission may have tacitly assumed must-carry obligations in the markets under examination, its broad conclusion that cable television poses no "significant threat" appeared to rest largely on factors wholly unrelated to mandatory carriage. Economic Inquiry Report, 71 FCC2d at 661. Specifically, at least with respect to VHF licensees, the Commission looked to demographic trends, forecasts of the national economy, and the already abnormally high rate of return on investment earned by broadcasters to conclude that such broadcasters not only were not suffering unduly from competition from cable but could anticipate a "steady growth in * * * station revenues" in the future. Id. Far from "assum[ing] the continuation of the must carry rule[s]," the analysis of VHF stations appears to deny their major premise--that unfettered growth of cable television threatens the economic vitality of local broadcasting.2.
 
 
 72
 But even if we accept the Commission's position that it continues to stand by the economic assumptions on which the must-carry rules are premised, we would still be unable to conclude that it has adequately carried its heavy burden of justification. For if the FCC has not repudiated the rules' underlying assumptions, neither has it proved them. Twenty years ago the Commission acknowledged that it simply did not know what effect the advent of cable television would have on local television. First Report and Order, 38 FCC at 710 ("we think it impossible, with the data at hand, to isolate reliably the effects of CATV"). Relying on what it later described as "a more or less intuitive model" and its "collective instinct," Notice of Inquiry, 65 FCC2d at 9, 14, it concluded that the threat to local television was sufficiently plausible to warrant promulgation of the must-carry rules. In light of the concededly speculative nature of its analysis, however, the Commission expressly recognized its "responsibility to get the facts * * * and to act upon them by revising or eliminating the restrictions on CATV as new information or experience more clearly illuminated the locus of the public's interest in the matter." Economic Inquiry Report, 71 FCC2d at 649-650 (footnotes omitted).
 
 
 73
 For many of its cable regulations, the Commission, with admirable vigor and creativity, has met its acknowledged responsibility to move beyond unsubstantiated intuition. For the must-carry rules, however, the Commission's promise "to get the facts" remains unfulfilled. Id. In the two decades since the rules' original promulgation, the Commission has never seriously examined any of the admittedly speculative links in the chain of reasoning advanced in support of the rules. In particular, it has never sought support for the assumptions that are the linchpins of its analysis: (1) that without protective regulations cable subscribers would cease to view locally available off-the-air television either because they would disconnect their antennas or because the inconvenience of a switching device would deter them; and (2) that even if some cable subscribers did abandon local television, they would do so in sufficient numbers to affect the economic vitality of local broadcasting. Indeed, as noted above, to the extent the Commission has addressed these issues at all, it has questioned their validity.[48]
 
 
 74
 In short, here, no less than in Home Box Office, the FCC has failed to "put itself in a position to know" whether the problem the rule seeks to cure--the destruction of free, local television--"is a real or merely a fanciful threat." 567 F.2d at 50. That approach, we have concluded, falls far short of the burden the government must affirmatively bear to prove the substantiality of the interest served by the rules. See First National Bank of Boston v. Bellotti, supra, 435 U.S. at 786, 98 S.Ct. at 1421; Preferred Communications, Inc. v. City of Los Angeles, supra, 754 F.2d at 1406 n. 9. Although in some instances "complete factual support * * * for the Commission's judgment or prediction is not possible or required," FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 814, 98 S.Ct., 2096, 2121, 56 L.Ed.2d 697 (1978), as we now explain, the particular circumstances of this constitutional challenge make continued deference to the Commission's concededly unsupported determinations plainly inappropriate.
 
 
 75
 We note first that, in sharp and unexplained contrast to its defense of the must-carry rules, the Commission itself now applies a far more rigorous standard of proof before crediting the broadcast industry's inevitable refrain that regulation is essential to protect it from the deleterious effects of new video technologies. As a matter of explicit agency policy, the Commission will consider such regulation only if presented with "hard evidence" that the new technology "will have a critically adverse effect on existing broadcast service." DBS Inquiry, 90 FCC2d at 689. "[S]peculative allegations concerning possible reductions in service from other sources" simply will not do. Id. at 691. Indeed, one Commissioner surveyed the FCC's post-1979 regulatory posture and concluded that the Commission had effected a complete reversal of the burden of proof applied in assessing the need for cable regulations.
 
 
 76
 In effect, [the Commission's initial policy toward cable] assumed harm to the public interest before it materialized and placed a heavy burden of proof on new technology and additional services to show that they would not injure the status quo. * * * As the [Economic Inquiry Report ] makes plain, something more than mere conjecture or intuitive assumptions should be required before we impose regulatory constraints and burdens on one industry or technology in favor of another. * * * With these actions, the burden of proof is now where it properly belongs: on those seeking protection against competition, diversity, and innovation.
 
 
 77
 Economic Inquiry Report, 71 FCC2d at 949 (concurring statement of Commissioner Fogarty). In light of the Commission's express unwillingness to premise intrusive regulations on unsubstantiated speculation, we find it difficult to sustain the suggestion that we defer to the Commission's admittedly unproven belief that the must-carry rules in fact serve the substantial interest of protecting local broadcasting.
 
 
 78
 Moreover, this is demonstrably not an instance in which "complete factual support * * * for the Commission's judgment or prediction is not possible * * *." FCC v. National Citizens Committee for Broadcasting, supra, 436 U.S. at 814, 98 S.Ct. at 2121. When the FCC first asserted jurisdiction 20 years ago, the cable industry was in its infancy and its impact on local broadcasting could not be gauged with accuracy. In that historical context, courts faced with nonconstitutional claims concerning the breadth of the FCC's jurisdiction consistently and appropriately deferred to the Commission's admittedly speculative fears that the advent of cable television would displace local broadcasting. See, e.g., United States v. Southwestern Cable Co., supra, 392 U.S. at 175, 88 S.Ct. at 2004. Nearly two decades have now passed, and the Commission has shown itself capable of the most sophisticated analysis of the effects of cable on conventional television. See Economic Inquiry Report, 71 FCC2d at 673. And yet, even in the context of a serious constitutional challenge, a context in which it must affirmatively bear the burden of proof, Elrod v. Burns, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976) (plurality opinion), it continues to rely on precisely the kind of "speculative allegations" it expressly refuses to credit elsewhere. DBS Inquiry, 90 FCC2d at 691. At some point, especially where First Amendment rights are at stake, the Commission must do more than ask us to defer to its "more or less intuitive model" and "collective instinct" to sustain its assertion that a rule is both necessary and important. Economic Inquiry Report, 71 FCC2d at 634. Where, as here, the Commission itself has expressly acknowledged that its regulatory premises are susceptible of empirical proof[49] and, in fact, has demanded such proof as a prerequisite of regulation in analogous contexts, we believe that point has passed.
 
 
 79
 We reiterate that this case has not required us to decide whether, as an abstract proposition, the preservation of free, local television service qualifies as a substantial and important governmental interest. We hold only that in the particular circumstances of this constitutional challenge the Commission has failed adequately to demonstrate that an unregulated cable industry poses a serious threat to local broadcasting and, more particularly, that the must-carry rules in fact serve to alleviate that threat. Should the Commission move beyond its "more or less intuitive model," as it clearly has the capacity to do, we would be extremely hesitant to second-guess its expert judgment. As long as it continues to rely on wholly speculative and unsubstantiated assumptions, however, our powerful inclination to defer to the agency in its area of expertise must be tempered by our duty to assure that the government not infringe First Amendment freedoms unless it has adequately borne its heavy burden of justification. That, we have determined, the Commission has not done.
 
 B. The Congruence Between Means and Ends
 
 80
 Even were we to conclude that the Commission adequately demonstrated the substantiality of the interest served by the must-carry rules, we could uphold their validity only if the restriction on activity protected by the First Amendment were "no greater than is essential to the furtherance of that interest." Home Box Office, Inc. v. FCC, supra, 567 F.2d at 48, quoting United States v. O'Brien, supra, 391 U.S. at 377, 88 S.Ct. at 1679. The task of evaluating the constitutional sufficiency of the congruence between the government's means and its ends is often a delicate one. On the one hand, we must, at the very least, make sure that the challenged regulation not gratuitously impinge on protected activity that poses no threat to the interest the agency is seeking to further. United States v. Albertini, --- U.S. ----, ----, 105 S.Ct. 2897, 2907, 85 L.Ed.2d ---- (1985). On the other hand, we must be careful not to lose sight of our proper role in the constitutional scheme. As this court recently had occasion to observe, our duty to police the First Amendment's requirement that intrusive governmental action be narrowly tailored to the evil sought to be corrected does not imply the authority to "finetune" administrative regulations. White House Vigil for ERA Committee v. Clark, 746 F.2d 1518, 1529 (D.C.Cir.1984); see also Clark v. Community for Creative Non-Violence, --- U.S. ----, 104 S.Ct. 3065, 3072, 82 L.Ed.2d 221 (1984). An agency typically has broad discretion over the manner in which it endeavors to effect its public interest objectives. Once we have determined that the agency action falls within the wide range of constitutionally permissible regulatory options, our task is at an end.[50]
 
 
 81
 Fully aware of the breadth of the agency's discretion and the concomitant limits on the scope of our review, our analysis leaves us with no doubt that the must-carry rules, as currently drafted, represent a "fatally overbroad response" to the perceived fear that cable will displace free, local television. FEC v. National Conservative Political Action Committee, --- U.S. ----, 105 S.Ct. 1459, 1470, 84 L.Ed.2d 455 (1985). We stress that "[w]e are not quibbling over fine-tuning * * *." Id. at 1471. For, as we now show, it is difficult to imagine a less discriminating or more overinclusive means of furthering the Commission's stated objectives.
 
 1.
 
 82
 In the Commission's own words, the must-carry rules are designed to "maintain the availability of local broadcast service to both those who [are] cable subscribers and those who [are] not." Opinion and Order, Turner JA at 2. The goal is to assure that "as many communities as possible * * * have the opportunity of enjoying the advantages that derive from having local outlets that will be responsive to local needs." Economic Inquiry Report, 71 FCC2d at 644, quoting Sixth Report and Order, 41 FCC 148, 172 (1952). Thus, and the distinction is critical, the rules seek to protect local broadcasting and not local broadcasters. As the Commission itself acknowledges, it "cannot reject a new [video] service solely because its entry will reduce the revenues or profits of existing licensees. * * * 'Plainly, it is not the purpose of the [Communications] Act to protect a licensee against competition but to protect the public.' " DBS Inquiry, 90 FCC2d at 689, quoting FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 1037 (1940). See also National Association of Broadcasters v. FCC, 740 F.2d 1190, 1198 (D.C.Cir.1984) ("existing licensees[ ] have no entitlement that permits them to deflect competitive pressure from innovative and effective technology"). Indeed, were the individual broadcasters themselves the object of the Commission's favors, the objective itself would be fundamentally illegitimate. In this regard, the Supreme Court's admonition in Buckley v. Valeo, supra, 424 U.S. at 48-49, 96 S.Ct. at 648-649, bears repeating: "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment * * *."
 
 2.
 
 83
 But, if the goal is to preserve "localism" and not "local broadcasters," the must-carry rules are "grossly" overinclusive. Home Box Office, Inc. v. FCC, supra, 567 F.2d at 50. The rules indiscriminately protect each and every broadcaster regardless of the quantity of local service available in the community and irrespective of the number of local outlets already carried by the cable operator. The 18th station is entitled to carriage no less than the first even if its programming is virtually duplicative of the viewing fare already transmitted over the cable system.[51] Indeed, it is entitled to carriage even if it carries no local programming at all.[52]
 
 
 84
 We readily acknowledge that it is for the Commission as Congress' delegate and not this court to address the essentially legislative question of the optimal amount of local service or programming in a given community. But in the context of the must-carry rules the FCC has simply never grappled with this issue. The rules themselves suggest an implicit determination that "more is better," but in those rare instances in which the Commission has intimated its views it has never taken so absolute a position. Indeed, in its most recent and comprehensive exposition of its regulatory objectives the Commission suggested that its goal was to preserve "a modicum of local programming," an objective significantly narrower than the undifferentiated sweep the must-carry rules would suggest. Economic Inquiry Report, 71 FCC2d at 661.[53] It is far from clear to us how a community that already has 17 local broadcast stations carried over the cable system is not already "enjoying the advantages that derive from having local outlets that will be responsive to local needs." Id. at 644.
 
 
 85
 It may well be that in some circumstances requiring carriage of the 18th broadcast station is consistent with the objective of preserving free, community-oriented television. And we certainly do not mean to imply that there is such a thing as too many communicative outlets in a given community. It is not the fact of the 18th station that is troubling, but the fact that it is guaranteed a channel even if carriage effectively bumps a cable programmer, regardless of the extent it impinges on the cable operator's editorial autonomy, and irrespective of whether it thwarts viewer preferences. Given the substantial First Amendment costs implicit in this sweeping guarantee, the Commission must make some effort to move beyond the amorphous in defining the interest served by the must-carry rules. Until it establishes a baseline for its general objective of preserving free, community-oriented television--measured by the number of local broadcast stations in the community, the amount of local programming, or any other criterion within its discretion to choose--we simply cannot know whether the rules are adequately tailored to pass constitutional muster. In this circumstance, the Commission has fallen far short of its "affirmative obligation" to show the requisite fit between means and ends. Revision of Programming, 49 Fed.Reg. at 33593 n. 46.
 
 3.
 
 86
 In addition to their complete indifference to the quantity of local television already available either over the air or on the cable system itself, the rules' overinclusiveness lies in their indiscriminate protection of every broadcaster regardless of whether or to what degree the affected cable system poses a threat to its economic well-being. Indeed, the Commission has expressly taken the position that the "financial health" of the broadcaster is irrelevant to its absolute right to occupy a channel on the local cable system. First Report and Order, 38 FCC at 713.[54] This blanket protection, by sweeping even the most financially secure broadcaster under the rules', beneficent mantle, reaches well beyond the rules' asserted objective of assuring that the advent of cable technology not undermine the financial viability of community-oriented, free television.
 
 
 87
 Significantly, this complete absence of any effort to analyze the extent to which the must-carry rules further their stated objective is in sharp contrast to the Commission's analysis elsewhere. In the Economic Inquiry Report, for example, the Commission found that any cable-induced audience loss suffered by VHF licensees, who already "earn substantially more than a normal return on their tangible investment," takes place "in a context of offsetting factors [such as] [i]ncreases in population and in the level of economic activity," which "result in a fairly steady growth in the demand for advertising exposures and in station revenues." Economic Inquiry Report, 71 FCC2d at 661. If, in fact, "offsetting factors" render VHF broadcasters (or an identifiable subset of that group) relatively immune to the competitive impact of cable, then rules designed to guard against their demise or diminished profitability are clearly pointless. Yet, oblivious to the must-carry rules' primary object of protecting local broadcasters from competitive injury (and thus preserving localism), each and every broadcaster from the struggling UHF educational station to the most profitable VHF network affiliate--no matter how profitable, no matter how invulnerable to significant cable-induced revenue losses--can demand mandatory carriage.
 
 
 88
 We note again that it is for the Commission and not this court to ascertain which broadcasters or classes of broadcasters are sufficiently at risk to warrant protection. We observe only that the Commission's failure to draw any lines at all makes it impossible to conclude that it has satisfied its affirmative obligation to prove that the rules are "sufficiently tailored to the harms it seeks to prevent to justify its substantial interference" with First Amendment rights. FCC v. League of Women Voters of California, supra, 104 S.Ct. at 3124. At some point the goal of preserving localism becomes undifferentiated protectionism.[55] Until the Commission makes some effort to demonstrate the contrary, the blunderbuss approach of the rules in their current form makes inescapable the conclusion that that point has been passed.
 
 IV. CONCLUSION
 
 89
 Regulation of emerging video technologies requires a delicate balancing of competing interests. On the one hand, a regulatory framework that throttles the growth of new media or otherwise limits the number and variety of outlets for expression is likely to run afoul of the First Amendment's central mission of assuring "the widest possible dissemination of information from diverse and antagonistic sources," Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945). On the other hand, unfettered growth of new video services may well threaten other deeply ingrained societal values. In particular, the complete displacement of expressive outlets attuned to the needs and concerns of the communities they serve not only would contravene a long-standing historical tradition of a locally oriented press but might itself disserve the objective of diversity.
 
 
 90
 When the Commission strikes this balance in favor of regulations that impinge on rights protected by the First Amendment, it assumes a heavy burden of justification. As the Supreme Court made clear long ago, "Mere * * * preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939). Even where the infringement on protected First Amendment rights is incidental to the pursuit of other legitimate objectives, the government must affirmatively demonstrate that the regulation is narrowly tailored to serve a substantial interest.
 
 
 91
 After extensive examination of the purposes and effects of the must-carry rules, we have concluded that the Commission has failed to carry this heavy burden. After the passage of nearly two decades, and despite its demonstrated capacity to do so, the Commission has failed entirely to determine whether the evil the rules seek to correct "is a real or merely a fanciful threat." Home Box Office, Inc. v. FCC, supra, 567 F.2d at 50. Moreover, because the must-carry rules indiscriminately sweep into their protective ambit each and every broadcaster, whether or not that protection in fact serves the asserted interest of assuring an adequate amount of local broadcasting in the community, the rules are insufficiently tailored to justify their substantial interference with First Amendment rights.
 
 
 92
 We stress that we have not found it necessary to decide whether any version of the mandatory carriage rules would contravene the First Amendment. We hold only that in their current form they can no longer stand. Accordingly, with respect to petitioner Quincy, we vacate the order requiring compliance with the must-carry rules and imposing a fine for its failure to do so. With respect to petitioner TBS, we vacate the order that reaffirmed the constitutional validity of the rules as a basis for denying the petition for rulemaking. Given our general conclusion that the rules are unconstitutional, we need not confront the delicate question of our power to compel rulemaking. Should the Commission wish to recraft the rules in a manner more sensitive to the First Amendment concerns we outline today, it is, of course, free to do so. We would consider the constitutionality of the product of that effort at the appropriate time.
 
 
 93
 So ordered.
 
 
 
 [1]
 The terms "cable television operator" or "cable system" refer to the entity that physically delivers video signals via coaxial cable into the homes and offices of its paying subscribers. A "cable programmer," in contrast, is an independent service that provides cable operators with programming to transmit over their systems. For cable programmers to reach their intended audience they must obtain access to a channel on a cable system. Typically, most of a cable operator's viewing fare consists of programming provided by cable programmers and retransmission of local over-the-air broadcast signals. See note 2 infra
 
 
 [2]
 The term "broadcast television" refers to conventional commercial or public television, the signals of which are transmitted "over the air" to the viewer's television set
 
 
 [3]
 Among TBS's many holdings are Cable News Network (CNN) and CNN Headline News. CNN provides 24-hour news programming and is currently available on over 4,800 of the nearly 6,200 operational cable systems across the country. SATELLITE SERVICES REPORT, May 1984, reproduced as Appendix to brief for National Cable Television Association, Inc., intervenor in No. 83-2050. CNN Headline News, currently picked up by 1,200 cable systems, provides continuous summaries of national and international news. Id
 
 
 [4]
 Petition for Rulemaking filed by Turner Broadcasting System, Inc., October 15, 1980, Joint Appendix to No. 83-2050 (Turner JA) at 5-17
 
 
 [5]
 Although the cases come to us in different procedural postures, Quincy and TBS mount virtually identical First Amendment challenges. Accordingly, we find it the most efficient course to consolidate the petitions on our own motion and address the constitutionality of the must-carry rules in the same opinion
 
 
 [6]
 In contrast to commercial broadcasters, public broadcasting stations derive their operating revenues from grants and contributions
 
 
 [7]
 Cable programmers derive revenues in a variety of ways. Many charge the cable systems that transmit their programming a small fee per subscriber. A few charge the subscriber a monthly fee in addition to that owed to the operator for basic cable service. Finally, a substantial number of cable programmers sell advertising time. See SATELLITE SERVICES REPORT, supra note 3
 
 
 [8]
 The Commission suggests that some currently operational systems have the capacity for 200 channels. Brief for respondents in No. 83-2050 at 4. See also Note, Cable Television and Content Regulation: The FCC, the First Amendment and the Electronic Newspaper, 51 N.Y.U.L.REV. 133, 135 (1976) (Electronic Newspaper ) (describing potential channel capacity as "almost infinite")
 
 
 [9]
 Despite the widely held notion that cable systems have a virtually unlimited channel capacity, 38.7% of such systems have fewer than 20 channels. Communications Daily, June 1, 1984, at 4. Indeed, 12.4% of cable subscribers are served by systems with 12 or fewer channels. Brief for respondents in No. 83-2050 at 38 n. 27, citing Television and Cable Factbook, Cable & Services Volume at 1726 (1984)
 
 
 [10]
 Some analysts have taken a harsher view of the FCC's early regulatory posture. See, e.g., H.R.Rep. No. 98-934, 98th Cong., 2d Sess. 22 (1984), ("FCC policies in [the] 1960s and early 1970s unfairly inhibited the growth and development of cable."); Bollinger, Freedom of the Press and Public Access: Toward a Theory of Partial Regulation of the Mass Media, 75 MICH.L.REV. 1, 40 (1976) ("There is considerable evidence that the Commission has been more concerned with protecting the economic interests of conventional broadcasters than with fully exploiting the resources of cable technology.")
 
 
 [11]
 The Commission first sought to impose a must-carry requirement in 1962 as a condition for granting an application to construct a microwave system to transmit distant signals to a rural cable system. Carter Mountain Transmission Corp., 32 FCC 459 (1962), aff'd, 321 F.2d 359 (D.C.Cir.), cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963). In 1965 the requirement was applied to all microwave-fed systems. First Report and Order. A year later the FCC extended mandatory carriage obligations to all cable systems that carried at least one broadcast signal regardless of the means used to obtain that signal. Second Report and Order
 
 
 [12]
 For the current formulation, see 47 C.F.R. Secs. 76.5, 76.51, 76.53, 76.55, 76.57, 76.59, 76.61 (1984). In general, the rules require a cable system to carry the signals of all commercial television stations within 35 miles of the community served by the system, other stations in the same television market (as designated by the Commission), and all stations "significantly viewed in the community." The rules vary according to the size of the market in which the cable system is located. Quincy, Washington, for example, is considered to be "outside all major and smaller television markets." Accordingly, it was subject to 47 C.F.R. Sec. 76.57
 Until recently a cable operator's must-carry obligation arose only if it elected to transmit at least one broadcast signal. See 47 C.F.R. Sec. 76.5(a). Under the Commission's newly revised definition, however, carriage of local stations is mandatory even if the operator otherwise carries no broadcast signals. See Report and Order, FCC 85-179, April 11, 1985, at 7, 10. Ironically, under the revised approach cable systems that carry only broadcast signals will not be subject to the must-carry rules. Id.
 
 
 [13]
 The current waiver provision is codified at 47 C.F.R. Sec. 76.7. In general, the Commission has granted waivers extremely sparingly. For a rare example, see Group W Cable Inc., 57 Rad.Reg. (P & F) 637, 640 (1984). See generally In the Matter of Rules and Regulations With Respect to "Saturated" Cable Television Systems, 66 FCC2d 710, 713-714 (1977) (Saturated System Rulemaking ) (absent a "compelling showing" waiver will not be granted even if mandatory carriage obligations result in deletion of discretionary signals)
 
 
 [14]
 Brief for respondents in No. 83-2050 at 6
 
 
 [15]
 But see Amendment of the Commission's Rules Regarding Major Television Markets, 50 Fed.Reg. 2565, 2568-2569 (Jan. 17, 1985) (to be codified at 47 C.F.R. Sec. 76.51); see also 57 Rad.Reg. (P & F) 1061 (dissenting statement of Commissioner Patrick)
 
 
 [16]
 One version of the switch is currently available for $4.95. Turner JA at 124
 
 
 [17]
 See G. SHAPIRO, P. KURLAND & J. MERCURIO, CABLESPEECH: THE CASE FOR FIRST AMENDMENT PROTECTION 144 (1983) (CABLESPEECH); Petition of Quincy Cable TV, Inc. dated November 19, 1979, reproduced in Joint Appendix to No. 83-1283 (Quincy JA) at 13
 
 
 [18]
 The Commission acknowledged as much in its order denying TBS's petition. Opinion and Order, Turner JA at 3. However, fundamentally inverting the burden of justification for regulations that impinge on First Amendment freedoms, the Commission faulted TBS for its failure to provide economic data on the possible effect of deleting or modifying the rules
 In the Second Report and Order the Commission did look at studies suggesting, for example, a general pattern of growth in the number of homes served by cable. 2 FCC2d at 738-744. But, because of their incompleteness, the Commission concluded that such studies were of "limited value." Id. at 744.
 
 
 [19]
 The distant-signal rules limited the number of distant signals a cable operator could import into its market. The syndicated-exclusivity rules limited the carriage of particular programs on those imported distant signals. See generally Cable Television Report and Order, 36 FCC2d at 170-185
 
 
 [20]
 In Southwestern Cable the Court explicitly disclaimed reaching any question concerning the validity of the FCC's cable rules. 392 U.S. at 167, 88 S.Ct. at 2000. In Midwest I the plurality opinion suggested in a footnote that the Eighth Circuit had correctly upheld the validity of several cable regulations. 406 U.S. at 659 n. 17, 92 S.Ct. at 1866 n. 17. However, the context of the reference makes clear that the plurality meant to suggest merely that the Eighth Circuit had correctly held that the particular rules at issue were within the standard set out in Southwestern Cable for testing the reach of the FCC's jurisdiction. In any event, as the Midwest II Court later acknowledged, the plurality's footnote in Midwest I was pure "dicta." 440 U.S. at 697 n. 7, 99 S.Ct. at 1439 n. 7. Indeed, the Midwest II Court, though not reaching any constitutional questions implicated by the particular regulations before it, described those questions as "not frivolous." 440 U.S. at 709 n. 19, 99 S.Ct. at 1446 n. 19
 
 
 [21]
 But see Omega Satellite Products Co. v. City of Indianapolis, 694 F.2d 119, 127 (7th Cir.1982)
 
 
 [22]
 Cablecasting refers to origination of programming on a cable television system either by the operator itself or by entities that lease (or are given) channel space by a cable operator. Home Box Office, Inc. v. FCC, 567 F.2d 9, 17 n. 2 (D.C.Cir.) (per curiam ), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)
 The Commission suggests that Home Box Office is inapposite because the decision was confined to issues relating to non-broadcast programming. The argument is unavailing. We note first that TBS describes both CNN and CNN Headline News as "non-broadcast" services. Brief for petitioner in No. 83-2050 at 3. In any event, the Home Box Office court expressly repudiated the reasoning of decisions that had upheld the constitutional validity of regulations prohibiting transmission of distant broadcast signals. 567 F.2d at 45 n. 80. With respect to Black Hills Video, the case relied on by the Commission in this controversy, the court stated: "To the extent that Black Hills Video stands for the proposition that the Commission in some sense 'owns' the broadcast spectrum and can condition use of the signals accordingly, it must be rejected." Id. Moreover, although the decision did suggest that the rationale justifying lesser First Amendment scrutiny for broadcast regulation (the "scarcity rationale") might retain some force in the context of granting a microwave license to a cable operator, it expressly did not suggest that the FCC's power over microwave radio links implied a constitutionally permissible authority over cable generally. Indeed, in its general discussion of the inapplicability of the scarcity rationale to cable the court drew no distinction among the various sources of signals ultimately transmitted to the subscriber. 567 F.2d at 44-45.
 
 
 [23]
 See notes 1 & 7 supra. For both CNN and CNN Headline News the cable operator pays a small charge per subscriber. SATELLITE SERVICES REPORT, supra note 3
 
 
 [24]
 In light of this injury, TBS clearly has standing to raise this claim. In numerous petitions for waiver from the force of the must-carry rules, cable operators have expressly indicated that application of the rules would preclude carriage of TBS programming. See, e.g., letter petition for waiver of Quincy Cable Co., Quincy JA at 37-40; supplemental brief for petitioner in No. 83-1283 at 6 (indicating that application of must-carry rules would prevent carriage of CNN altogether or force the operator to relegate CNN to another, more expensive tier of channels accessible to substantially fewer subscribers). Denial of those waiver petitions, see, e.g., In re Quincy Cable TV, Inc., 89 FCC2d 1128 (1982), Quincy JA at 12, necessarily results in significant injury to TBS, injury that is easily sufficient to constitute "injury in fact." The injury is especially acute in the case of systems "saturated" with must-carry signals. See brief for respondents in No. 83-2050 at 38 n. 27 (acknowledging existence of saturated systems). See also Saturated System Rulemaking, 66 FCC2d at 710-14. In those circumstances, the operator could not possibly purchase any TBS programming
 While, of course, it cannot be said with absolute certainty that invalidation of the must-carry rules would redress this economic injury--a cable operator might still elect not to purchase any TBS programming--certainty is not a constitutional prerequisite. See Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (injury must be "fairly " traceable to the challenged action and "likely to be redressed by a favorable decision") (emphasis added); Autolog Corp. v. Regan, 731 F.2d 25, 31 (D.C.Cir.1984). Where, as here, TBS can point to assertions by cable operators that, but for the must-carry rules, they would carry its programming, we have no doubt that the likelihood that the injury would be redressed by a favorable decision is sufficiently high to confer standing. In any case, the Supreme Court has recognized that a plaintiff who has been entirely deprived of any opportunity to compete has standing to challenge the constitutionality of that deprivation. Regents of University of California v. Bakke, 438 U.S. 265, 280-81 n. 14, 98 S.Ct. 2733, 2742-43 n. 14, 57 L.Ed.2d 750 (1978) (plurality opinion).
 
 
 [25]
 Because the Spokane signals originated over 125 miles away, viewers in Quincy could receive them in intelligible form only with the help of a UHF translator. A translator amplifies and rebroadcasts off-air signals and is common in areas in which direct reception is hindered by distance or intervening terrain barriers
 
 
 [26]
 Although two of the stations requested carriage in the course of opposing the waiver, Quincy's must-carry obligations did not ripen until the expiration of the stay automatically granted during the pendency of a waiver petition. See 47 C.F.R. Sec. 76.7(g). We do not address Quincy's contention that the Commission's construction of the automatic stay provision was erroneous
 
 
 [27]
 Quincy also contended that mandatory carriage of a broadcast signal constitutes a compensable taking under the Fifth Amendment. In light of Quincy's failure to allege damages, we read its takings argument to be an alternative ground for invalidating the rules. Because we find the rules infirm under the First Amendment, we need not and do not address Quincy's Fifth Amendment contentions
 
 
 [28]
 During the course of the lengthy proceedings before the Commission, Quincy had expanded its channel capacity. Although now willing to carry the Spokane signals, it objected to the requirement that it carry them on its "basic tier" of 12 channels, the only service taken by most of its subscribers. Although the record is not entirely clear, it appears that the Commission imposed the $5,000 fine while Quincy had a 12-channel capacity. Moreover, we note that the interference with Quincy's editorial autonomy, a value protected by the First Amendment, does not disappear with an increase in channel capacity. See note 41 infra
 
 
 [29]
 The parties do not contest our authority to consider the constitutionality of the rules in the context of reviewing the denial of Turner's petition for rulemaking. Nonetheless, because our jurisdiction is implicated, we briefly address the point. A petition for rulemaking cannot create jurisdiction in this court to adjudicate the legality of rules that would otherwise be unreviewable. However, because Turner had demonstrated ongoing injury from the enforcement of these regulations sufficient to confer standing, see note 24 supra, the constitutionality of the must-carry rules is properly before us, albeit in this unusual posture. Since the rules will never be enforced directly against Turner--but only against cable operators to whom Turner wishes to sell programming--this is the only opportunity Turner would have to raise these claims
 
 
 [30]
 See note 8 supra
 
 
 [31]
 In one instance the Supreme Court did appear to look beyond spectrum scarcity to determine the appropriate standard against which to evaluate the constitutionality of a broadcast regulation. FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (upholding FCC's power to regulate "indecent" speech broadcast over radio). Pacifica's holding, however, is extremely "narrow[ ]," id. at 750, 98 S.Ct. at 3041, and its reasoning has subsequently been limited to the particular circumstances of the case. See Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 74, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983). In addition, we note that several courts have held that Pacifica 's rationale is inapposite in the context of cable television regulation. See, e.g., Cruz v. Ferre, 755 F.2d 1415, 1420-1421 (11th Cir.1985) (focusing on cable subscriber's affirmative monthly decision to bring cable or a particular cable channel into his or her home and on the availability of a "lock box" to regulate viewing habits of children); Community Television of Utah, Inc. v. Roy City, 555 F.Supp. 1164 (D.Utah 1982)
 
 
 [32]
 This court has also observed that technological advances may have rendered the "scarcity rationale" obsolete even for broadcasters. Loveday v. FCC, 707 F.2d 1443, 1458-1459 (D.C.Cir.1983). Numerous scholars have taken the same position. See, e.g., Fowler and Brenner, A Marketplace Approach to Broadcast Regulation, 60 TEX.L.REV. 207, 221-226 (1982). The Supreme Court recently suggested, however, that it was not prepared to reconsider its "long-standing approach" to the broadcast medium. FCC v. League of Women Voters of California, --- U.S. ----, 104 S.Ct. 3106, 3116 n. 11, 82 L.Ed.2d 278 (1984). Although the Court in League of Women Voters applied to a broadcast regulation a standard of review similar to that sometimes applied to rules affecting other media, it made clear that the particular law at issue would receive far more exacting scrutiny if it were directed at non-broadcast speech
 
 
 [33]
 See CABLESPEECH, supra note 17, at 107
 
 
 [34]
 See also B. SCHMIDT, FREEDOM OF THE PRESS VS. PUBLIC ACCESS 200 (1975); Electronic Newspaper, supra note 7, 51 N.Y.U.L.REV. at 146
 
 
 [35]
 Although in some contexts the government carries an extraordinarily "heavy burden of showing justification," New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (per curiam ), the decisions at least contemplate (although they rarely in fact find) the existence of an interest that is so compelling that the regulation will be reluctantly upheld. See, e.g., Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 535, 540, 100 S.Ct. 2326, 2332, 2334, 65 L.Ed.2d 319 (1980); First National Bank of Boston v. Bellotti, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978). See also B. SCHMIDT, supra note 34, at 232-233. Some justifications, however, are patently illegitimate and simply will not be weighed in the balance. Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984). Where the object of the regulation is related to suppression or protection of a particular viewpoint, it is invalid unless it falls within one of a small number of strictly circumscribed categories. See Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 HARV.L.REV. 1482 (1975)
 
 
 [36]
 See Ely, supra note 35, 88 HARV.L.REV. at 1496-1497
 
 
 [37]
 In the context of the print media, for example, it seems highly unlikely that a law requiring vendors of newspapers to carry local publications would be treated as an incidental burden on speech even though in some sense the purpose of the rule was viewpoint-neutral
 
 
 [38]
 One operator recently objected to the carriage of the religious programming of a local broadcaster. See In re Group W Cable, Inc., supra note 13, 57 Rad.Reg. (P & F) at 638. The Commission denied the requested waiver
 
 
 [39]
 As late as the mid-1970's it was not uncommon to suggest that the cable operator exercised no editorial discretion. See, e.g., B. SCHMIDT, supra note 34, at 213. In today's video marketplace, especially in light of the advent of the cable programming industry, that suggestion is clearly anachronistic
 We need not decide whether the cable operator's editorial discretion is of the same order as that of a broadcaster or a newspaper. See Midwest II, 440 U.S. at 707-08 n. 17, 99 S.Ct. at 1445 n. 17. We have no doubt, however, that it is of sufficient magnitude to implicate the First Amendment.
 
 
 [40]
 But see B. SCHMIDT, supra note 34, at 233-35 (describing absence of balancing in Miami Herald as aberrational and suggesting that such an approach would not invariably be followed)
 
 
 [41]
 Applying this reasoning to Quincy suggests that it makes little difference to the analysis whether the cable system has two channels or 200
 
 
 [42]
 The Commission and several intervenors obliquely suggest that, in addition to preserving localism, the rules are an integral part of the federal copyright scheme and, as such, serve another important interest. See 17 U.S.C. Sec. 101 et seq. (1982). Under the Copyright Revision Act of 1976, cable operators are granted a compulsory license to retransmit broadcast signals in return for payment of a copyright royalty fee. Id. Sec. 111(c)-(d). The obligation to pay royalties arises only from carriage of distant (non-network) signals, defined as those extending "beyond the local service area of the primary transmitter." Id. The legislative history makes clear that the "local service area" corresponds to the area in which the station is entitled to mandatory carriage. H.R.Rep. No. 94-1476, 94th Cong., 2d Sess. 99 (1976)
 Neither the Commission nor the intervenors direct our attention to any suggestion in the Act or elsewhere that the must-carry rules serve as anything more than a convenient reference point for determining where a local signal ends and a distant signal begins. By invalidating the must-carry rules on First Amendment grounds, we do not, of course, suggest that they may not continue to serve that function.
 
 
 [43]
 As recently as last year, this court recognized "the importance of local broadcasting to a national broadcasting system." National Association of Broadcasters v. FCC, 740 F.2d 1190, 1198 (D.C.Cir.1984). See also Capital Cities Cable, Inc. v. Crisp, --- U.S. ----, 104 S.Ct. 2694, 2708, 81 L.Ed.2d 580 (1984). That view is clearly shared by Congress. Although the Commission's pursuit of "localism" is not embodied in an explicit statutory command, Inquiry Into the Development of Regulatory Policy in Regard to Direct Broadcast Satellites, 90 FCC2d 676, 686 (1982) (DBS Inquiry ), Congress has expressed its commitment to "a widely dispersed radio and television service" and has noted that the elimination of local service is a "matter of real and immediate public concern." United States v. Southwestern Cable Co., 392 U.S. 157, 173 & n. 38, 88 S.Ct. 1994, 2008 & n. 38, 20 L.Ed.2d 1001 (1968), quoting S.Rep. No. 923, 86th Cong., 1st Sess. at 7 (1959)
 
 
 [44]
 Even in the context of reviewing legislative acts, the Supreme Court has frequently required more than an unsubstantiated assertion of the importance of the governmental interest. See Members of City Council of Los Angeles v. Taxpayers for Vincent, supra note 35, 104 S.Ct. at 2128 n. 22 (Court "may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgement of expressive activity"); Schad v. Borough of Mount Ephraim, 452 U.S. 61, 72-73, 101 S.Ct. 2176, 2184-85, 68 L.Ed.2d 671 (1981) (rejecting government's claim in part because no evidence offered to support argument that zoning ordinance serves asserted interest)
 
 
 [45]
 TBS also contends that the FCC's deregulatory efforts imply a complete abandonment of its concern for localism. That contention, we have concluded, is incorrect. It simply does not follow that deregulation, even massive deregulation, implies a wholesale abandonment of the goal of preserving local broadcast television. Although the Commission of late has pursued different means to that end--preferring to rely on the free market rather than active administrative oversight--it has never wavered from its view that preservation of local television is a cornerstone of its regulatory policy. In deleting the distant-signal rules, for example, the Commission observed that it was doing so only on the basis of its conclusion that elimination of the rules "creat[ed] no risks of serious harm to the welfare of off-the-air television viewers." Syndicated Exclusivity Rules, 79 FCC2d at 825 (Appendix). See also Notice of Inquiry, 65 FCC2d at 10. Thus, standing alone, the fact of substantial deregulation of cable television does not undermine the Commission's assertion that it remains ever vigilant to guard against the possibility that cable will threaten the economic viability of free, local broadcasting
 
 
 [46]
 The Notice of Proposed Rulemaking and the Economic Inquiry Report were adopted on the same day. The Notice, however, incorporated by reference the general findings of the Economic Inquiry Report and made clear that those findings were the predicate for its decision to institute rulemaking to delete the distant-signal-carriage and syndicated-exclusivity rules. The FCC directs our attention to references to mandatory carriage in the Economic Inquiry Report, see brief for respondents in No. 83-2050 at 11, citing 71 FCC2d at 658. But those passages merely describe the status quo; they contain no suggestion that the economic analysis depended on maintaining those regulations
 
 
 [47]
 It is perfectly possible that an analysis focusing on one rule could reach conclusions that undercut the premises underlying another
 
 
 [48]
 In addition to casting doubt on the fragility of the economic health of many broadcasters, the Commission also appears to have denied that a switching device, such as an A/B switch, poses a significant barrier to receiving off-air signals. In the Matter of Rules and Regulations to Require Carriage of Subscription Television Signals, 77 FCC2d 523, 529 (1980). If, then, the act of flicking a switch is not a significant deterrent to viewing off-air signals, cable subscribers, if given such a switch, could still receive local broadcasts provided only that their antennas remained attached. Thus the economic rationale underlying the must-carry rules--preventing audience fragmentation with its concomitant impact on station revenues--turns on whether cable subscribers will actually disconnect their antennas. That purported phenomenon is almost certainly susceptible of empirical proof
 
 
 [49]
 "Truths hitherto established by collective instinct may be verified * * * [or] disproved." Notice of Inquiry, 65 FCC2d at 14
 
 
 [50]
 The trick, of course, is to determine the contours of this "zone of constitutionality." See White House Vigil for ERA Committee v. Clark, 746 F.2d 1518, 1542 (D.C.Cir.1984) (Wald, J., concurring in the judgment in part and dissenting in part)
 
 
 [51]
 The Commission does not contest TBS's contention that in some instances cable operators are obligated to carry over 20 mandatory signals
 
 
 [52]
 This prospect is by no means entirely academic. Under the Commission's recently revised approach, broadcast licensees need no longer provide specified amounts of community-oriented programming, but instead can rely, at least in part, on the offerings of other local stations to satisfy their programming obligations. Revision of Programming, 49 Fed.Reg. at 33588, 33592-33594. Perhaps spurred by this change, several broadcasters have announced plans to provide a full day of music videos, programming that, of course, is devoid of any local orientation at all. Broadcasting, June 25, 1984, at 50
 Commenting on the disparity between the rule's goal of preserving localism and the effect of its application to Quincy Cable, the dissenting Commissioner in Quincy observed:
 In the maze of arguments and counterarguments adduced in this matter it is easy to lose sight of the essential issue: who is to decide what programming this small cable system in this small town in central Washington shall provide its customers? In my view that decision should as a matter of policy, and perhaps as a matter of law, rest with Quincy Cable.
 Our "must carry" rules are intended to ensure that signals locally available over the air are not lost to customers who subscribe to a cable service and disconnect their antennas. That such customers could retain access to local signals by availing themselves of a switch or simply disconnecting the cable and reconnecting their antennas at any time may be put to one side. The important point in this case is that none of the signals in question appears to be "local", except perhaps in a Pickwickian sense. The choice is between signals imported either from Seattle or Spokane, with Seattle about 130 miles distant to the west and Spokane about equally distant to the east. There is no suggest[ion] that any of the stations target any of their programming to Quincy.
 * * *
 * * * Since I believe the Commission's disposition of this case is wrong as a matter of policy, and even plain common sense, I find it unfortunate that Quincy Cable must either accede to that disposition or incur the expense of seeking review by the courts. If, however, it does seek review, I believe it may ultimately succeed in convincing the reviewing court that the regulation here in question is without rational justification and/or unconstitutional.
 Quincy JA at 34-36 (Commissioner Jones, dissenting).
 
 
 [53]
 Compare First Report and Order, 38 FCC at 699 (stating that objective in 1965 was to assure a "large number of local outlets"). What constituted a "large number" was left unexplained. Similarly unexplained is how or whether the approximate doubling of the number of broadcast stations across the country since 1965 bears on this determination
 
 
 [54]
 The Commission recently required a cable system to carry broadcast signals that could not be received over the air in the system's community. In this circumstance the rule is completely adrift from its economic rationale. The affected cable system could not possibly have been injuring the benefitted broadcaster by fragmenting its audience. See Amendment of the Commission's Rules Regarding Major Television Markets, 50 Fed.Reg. 2565, 2568-69 (1985) (to be codified at 47 C.F.R. Sec. 76.51); see also 57 Rad.Reg. (P & F) 1061 (dissenting statement of Commissioner Patrick)
 
 
 [55]
 Especially troubling is that the rules apply with equal force regardless of the degree of intrusion on First Amendment freedoms. They draw no distinction between cable systems that carry 100 signals and those that carry 12. Nor do they distinguish between systems that are saturated with must-carry signals and those that are not. Moreover, occasional exceptions aside, the waiver procedure has been demonstrably insensitive to these concerns. See note 13 supra